UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| JAN LENNING,<br><br>      Plaintiff,<br><br>  vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>      Defendant. | 1:18-CV-01020-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Jan Lenning, seeks judicial review of the Commissioner's final

decision denying her application for social security disability and supplemental

security income disability benefits under Title II and Title XVI of the Social

Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. Lenning filed her application for both types of benefits. AR167-75, 227. Her coverage status for SSD

Ms. Lenning has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A. Procedural History

Ms. Jan Lenning filed for disability insurance benefits on June 5, 2015; she subsequently applied for supplemental security income benefits on November 9, 2015, alleging in both applications disability on the basis of severe depressive disorder with psychotic features beginning March 15, 2014.  AR167-168; 169-175; 227.  Her applications were initially denied on September 30, 2015, and again upon reconsideration on February 12, 2016.  AR74-89; 92-106; 107-121.  Ms. Lenning timely requested a hearing, which was granted and held before Administrative Law Judge (ALJ) William L. Hogan on June 14, 2017.  AR34-69.

---

benefits expires on December 31, 2019.  AR17.  In other words, in order to be entitled to Title II benefits, Ms. Lenning must prove disability on or before that date.

[2] These facts are recited from the parties' stipulated statement of facts (Docket 18).  The court has made only minor grammatical and stylistic changes.

Upon her date of disability onset, Ms. Lenning was considered a "younger individual" (45-49); however, during the pendency of her claims she shifted age categories to that of an individual "closely approaching advanced age" (50-54). AR27; 215. Ms. Lenning has past work experience as a registered nurse and at least a high school education. AR26-27.

Ms. Lenning accrued 72 consecutive quarters of covered earnings through her alleged date of onset and attempted to return to work from October 2014 through December 2014; she exceeded the threshold for substantial gainful activity with earnings from October and November, 2014, but the ALJ considered this an unsuccessful work attempt as her employment ended as a result of her symptoms. AR17-18; 177. Subsequent to the hearing, Ms. Lenning filed a "Post-Hearing Memorandum and Objections to the Vocational Witness' Testimony" on June 29, 2017. AR304.

The ALJ denied benefits on August 14, 2017. AR12-33. At step 2 of the sequential analysis, the ALJ found Ms. Lenning suffered from "severe" impairments of degenerative disc disease of the lumbar and cervical spine; major depressive disorder, recurrent, severe, with psychotic features; personality disorder, not otherwise specified (NOS); post-traumatic stress disorder (PTSD); and schizoaffective disorder, bipolar type. AR18. The ALJ found that Ms. Lenning was diagnosed with fibromyalgia, but that it was not a medically determinable impairment. Id.

The ALJ found that Ms. Lenning's impairments, considered singly or in combination, did not meet or medically equal the Agency's listings at step 3.

AR18.  The ALJ found that Ms. Lenning retained the residual functional capacity (RFC) to perform "light work," except she could only occasionally stoop, and frequently climb ladders, ropes, scaffolds, ramps, stairs, kneel, crouch and crawl; she could not even have moderate exposure to hazards; she retained the capacity to understand, remember and carry out routine, simple instructions, and could interact appropriately with supervisors, coworkers, and the general public; she could respond appropriately to changes in a routine work setting and could make judgments on simple work related decisions. AR20.  With this RFC, the ALJ found that Ms. Lenning was unable to perform her past relevant work as a registered nurse, and the ALJ found in Ms. Lenning's favor at step 4.  AR26.  Relying on vocational evidence, the ALJ found Ms. Lenning could perform "other jobs" in the national economy and denied benefits at step 5.  AR27.

The ALJ did not discuss or rule on Ms. Lenning's "Post-Hearing Memorandum and Objections to the Vocational Witness' Testimony" in the decision, but did include it on the exhibit list to the decision.  AR32. Ms. Lenning requested review before the Appeals Council, which denied her request by notice dated May 29, 2018.  AR1-6.

## B.     Relevant Medical Evidence

### 1.     Medical Opinion Evidence

On March 21, 2014, Dr. Jon McAreavey wrote Ms. Lenning a work note, detailing that she had been suffering from back pain with radicular symptoms and had been trying to work with restrictions while being treated.  AR485.

Dr. McAreavey stated Ms. Lenning's pain had not resolved despite conservative treatments of physical therapy, epidural, and medication; and thus, "at this time" she was limited to lifting less than ten pounds with no bending or twisting. AR485. Dr. McAreavey opined Ms. Lenning would likely need to be off work until further notice while she got better. Id.

State agency medical consultant Larry VanderWoude, M.D., opined on September 20, 2015, that Ms. Lenning can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push/pull without limitations other than shown for lifting and/or carrying; frequently climb ramps/stairs/ladders/ropes/scaffolds; frequently stoop, kneel, crouch, or crawl; balance without limitation; and must avoid even moderate exposure to hazards but has no other environmental limitations. AR84-85.

State agency psychological consultant, Doug Soule, Ph.D., opined that Ms. Lenning is moderately limited in the ability to carry out detailed instructions, but retains the capacity to do low stress, repetitive type work activities. AR86-87. On February 10, 2016, State agency psychological consultant Jerry Buchkoski, Ph.D., affirmed the prior State agency consultant opinion. AR104.

On February 11, 2016, state agency consultant Kevin Whittle, M.D., opined that Ms. Lenning can lift and/or carry 20 pounds occasionally or 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; push/pull without limitation other than shown

for lifting and/or carrying; frequently climb ramps/stairs/ladders/ropes/ scaffolds; balance without limitation; occasionally stoop; frequently kneel, crouch, or crawl; must avoid even moderate exposure to hazards and has no other environmental limitations. AR101-02.

On June 5, 2017, Carrie Dylla, PA-C, completed a form titled "Treating Source Statement-Psychological Conditions," noting her professional qualifications were as a physician assistant-certified NCCPA and listing the diagnoses for which she had provided treatment to Ms. Lenning as schizoaffective disorder, bipolar type; major depression, [with psychotic features]; and dyssomnia.[3] She stated she first started treating Ms. Lenning on April 7, 2015. AR757. PA Dylla offered a guarded prognosis. Id.

PA Dylla responded that the particular medical or clinical findings supporting her diagnoses and assessed limitations was "patient has exhibited instability of mood and thought, of severity to require inpatient psychiatric treatment." Id. PA Dylla responded "yes" to the following signs and symptoms: disturbance of mood accompanied by full or partial depressive syndrome and bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. Id.

PA Dylla identified on the form the following signs of depression: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; psychomotor agitations or retardation; decreased energy; feelings

---

[3] "Dyssomnia" is difficulty falling or remaining asleep.

of guilt or worthlessness; difficulty concentration or thinking; and thoughts of suicide. AR758.

PA Dylla identified on the form the following signs of manic syndrome: hyperactivity; pressured speech; flight of ideas; decreased need for sleep; easy distractibility; and hallucinations, delusions, or paranoid thinking. Id.

PA Dylla identified on the form the following sign of general anxiety disorder: motor tension. Id.

PA Dylla identified on the form the following sign of schizophrenia: delusions or hallucinations. Id.

PA Dylla identified on the form the following signs of loss of cognitive abilities: disorientation to time and place; memory impairment, either short-term, immediate, or long-term; change in personality; and emotional lability (explosive temper outbursts, sudden crying, etc.) and impairment in impulse control. Id. Addressing Ms. Lenning's memory impairment, PA Dylla wrote that Ms. Lenning did not recall her most recent inpatient hospitalization at Avera Behavioral Health. Id.

PA Dylla identified on the form the following other mental limitations: current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement; and a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Ms. Lenning to decompensate. Id.

PA Dylla left blank the question asking her to identify the particular clinical findings including results of mental status examination, which demonstrate the severity of Ms. Lenning's mental impairment and symptoms. Id.

PA Dylla opined that Ms. Lenning was markedly limited in her ability to understand, remember, or apply information; in her ability to interact with others; in her ability to concentrate, persist, or manage pace (such that would result in a failure to complete tasks in a timely manner, in work settings or elsewhere); and in her understanding and memory as she had disrupted stability of mood that impaired her cognitive functioning and her personal relationships. AR759-760.

Markedly limited was defined in the opinion as an individual's ability to function independently, appropriately, effectively, and on a sustained basis was seriously limited. AR759. PA Dylla opined that Ms. Lenning was moderately limited in her ability to adapt or manage herself due to her instable mood. Id. Moderately limited was defined as an individual's ability to function independently, appropriately, effectively, and on a sustained basis was fair. Id.

PA Dylla opined that Ms. Lenning was markedly limited in her ability to understand and carry out detailed, but uninvolved written or oral instructions and in remembering locations or work-like procedures. AR760. PA Dylla opined that Ms. Lenning was moderately limited in her ability to understand and carry out very short and simple instructions. Id. PA Dylla opined that Ms. Lenning was able to maintain attention and concentration for 15 minutes

before needing redirection or requiring a break and was not able to maintain regular attendance and be punctual within customary tolerances.  Id.

PA Dylla opined that Ms. Lenning required enhanced supervision.  Id. PA Dylla opined that Ms. Lenning could not work appropriately with coworkers or the general public, though she could sometimes, but not consistently, work with supervisors.  AR760-761.  PA Dylla explained the degree and extent of Ms. Lenning's capacity or limitation in social interaction as Ms. Lenning "experiences disruption of thought and instability of mood in social situations." AR761.  PA Dylla opined that Ms. Lenning did not have the ability to maintain socially appropriate behavior or respond appropriately to changes in work settings.  Id.

PA Dylla opined that Ms. Lenning would likely be "off task" (defined as the time in a typical workday her symptoms would be severe enough to interfere with the attention and concentration needed to perform even simple work-related tasks) more than 25% of the day.  Id.  PA Dylla opined that Ms. Lenning would likely be absent four or more days per month if working full-time due to her impairments and/or treatment.  Id.

### 2.    Evidence Related to Mental Impairments

On May 15, 2014, Ms. Lenning told Stacy Solsaa LPC-MH at an Employee Assistance Program that her back injury impacted her work, and her employer made her feel awkward using leave.  On examination, her mood/affect was frustrated, but her thought process and orientation were otherwise normal.  AR354.

On June 19, 2014, Ms. Lenning told LPC-MH Solsaa that she continued struggling with back pain and family problems. AR352. She was frustrated, and her mental status examination was otherwise unremarkable. AR352.

On August 1, 2014, Ms. Lenning was treated for depression, but she stated she did not feel anxiety was a problem at this time. AR427. She stated she took Ativan occasionally, did better when she was out and about, and denied any real panic attacks. Id.

On January 4, 2015, Ms. Lenning sought emergency treatment for a racing heart, palpitations, crying, fear and a possible anxiety attack with fatigue from not sleeping. AR367. She appeared anxious and slightly paranoid or bizarre. AR561.

She was prescribed Prozac at a follow up with her general practitioner two days later after having a normal mood and affect. AR367. She was told to take 10mg daily for one week, then 20 mg. Id. After starting 20 mg Prozac, Ms. Lenning reported being more anxious and was taking more Ativan. AR366. She was instructed to decrease her Prozac intake from 20 mg to 10 mg. Id.

On February 3, 2015, Ms. Lenning reported her anxiety exacerbated with worsening back pain; her depression had improved since summer, although she experienced increased emotional stress since Christmas and had difficulties falling asleep. AR364. Ms. Lenning stated she had been prescribed Celexa, but only took it a few weeks because she felt she was improved. Id. She stated she had also stopped taking fluoxetine because she believed it was causing uncomfortable flashbacks and clouding her thinking. Id.

10

Ms. Lenning's mood was depressed and she had a flat affect, but she had no evidence of delusion or hallucination and no suicidal ideation. AR365. Her Patient Health Questionnaire-9 (PHQ-9) score was 5, and her Generalized Anxiety Disorder-7 (GAD-7) score was 3. Id. For her back pain, she considered a referral to surgery, though opted to try amitriptyline[4] prior to having a consultation. Id.

On February 10, 2015, Ms. Lenning requested a note to stay out of work until March 3, but Dr. Pengilly and Dr. Wagoner stated she needed to attempt to work 20 hours per week, and, if she could not work 20 hours per week, she would need to see Dr. Pengilly earlier. AR363. Two days later, Ms. Lenning stated she just could not work and she would see her counselor and see what she thought. Id.

At a psychiatric diagnostic evaluation with LPC-MH Solsaa on February 12, 2015, Ms. Lenning presented as anxious, and her spouse reported strange behaviors; her thought process was unremarkable and she was oriented. AR351.

The next week, she attended an office visit with Rebecca L. Pengilly, M.D., reporting anger issues, wherein she took wine bottles out to the garage and broke but cleaned them up; while it improved her mood it worried her husband. AR361. After this incident, she asked her husband to stay home from work because of her anger issues and had a panic attack in the middle of

_____

[4] Amitriptyline is a tricyclic antidepressant that affects chemicals in the brain that may be unbalanced due to depression. https://www.drugs.com/ amitriptyline.html (all internet citations last checked February 22, 2019).

the night that eventually improved because her husband was present; however, an ambulance was called but she refused to go to the ER. Id.; AR362. At the time of the appointment, her mood had returned to normal; she was prescribed Citalopram and Alazopram for anxiety. AR361.

On March 2, 2015, Ms. Lenning was brought to Prairie St. John's Hospital by family members after struggling with several stressors and having difficulty functioning. AR391. According to her family, she was down and depressed for at least a year, with difficulty sleeping, and anxiety at night. Id. She acted bizarre and wrote things on the walls and doors, not making any sense at times. Id. She was on citalopram 10 mg per day and was supposed to increase the dose to 20 mg, but was not compliant with her medication. Id.

Ms. Lenning was admitted for psychiatric treatment and, upon admission, she was slowing in her emotions and responses, with mildly impaired concentration and attention span, psychomotor agitation, low tone and slow speech, depressed mood, associations not intact; impaired impulse control, and fair insight and judgment. AR409. Her memory was intact based on unstructured clinical review, and her intelligence was estimated as average. Id. Her capacity for activities of daily living were independent. Id.

She reported a significant history of a 20-year marriage to an ex-husband who was very abusive physically, emotionally, and verbally. AR409. The marriage had ended in divorce 10 years earlier. Id.

She was diagnosed with major depressive disorder, recurrent, severe with suicidal ideation; rule out schizoaffective disorder; posttraumatic stress disorder; panic disorder; and insomnia disorder.  AR410.

Throughout her hospitalization, Ms. Lenning complained about her medications being complicated, as she was prescribed numerous.  She was afraid of being on some medications that caused side effects; according to her family this stemmed from a childhood misdiagnosis that resulted in her being on medications for no clear reason.  AR398.  Though her medications were explained to her, she claimed she had no recollection of this explanation.  Id.

Cognistat testing revealed no memory problems, but she answered some questions with non-related answers, which she had done during interviews with psychiatric staff as well.  Id.  She slept better in the hospital and at times was isolating and acting bizarre, though she denied any psychotic symptoms.  AR401.

Upon discharge on March 9, 2015, Ms. Lenning denied any issues, aside from feeling tired; upon examination, her affect was constricted, a little brighter with interactions.  AR393.  She had fluent speech with low tone and rate, and though her thought processes were organized, logical, and goal directed, she was slow in processing.  Id.  Her attention and concentration were fair, and judgment and insight were fair to partial.  AR394.  She was discharged with diagnoses of major depressive disorder, recurrent; rule out schizoaffective disorder; post-traumatic stress disorder; panic disorder; rule out generalized anxiety disorder; insomnia, unspecified; and treatment noncompliance.

AR394-395. She was prescribed BuSpar[5] 10 mg, twice daily; Citalopram 20 mg daily; and Seroquel[6] 200 mg at bedtime. AR395.

Shortly after discharge, Ms. Lenning was admitted involuntarily to the South Dakota Human Services Center on March 14, 2015, for psychotic behavior, including writing on the walls with magic marker, disappearing during the night to drive for 100-200 miles and return the next day, gambling, and walking into a stranger's home and cooking. AR416; 504; 507. Prior to admission, she made suicidal statements; in addition to the psychiatric issues, she reported herself as being in poor health, complaining of nausea, arthritis and headache; an examination, however, was within normal limits. AR501-502; 516.

Upon admission, Ms. Lenning was assessed with a GAF[7] of 40. AR518. She was described as "pleasant" and "trying to be cooperative," however,

---

[5] BuSpar is an anti-anxiety medication used to treat symptoms of anxiety, such as fear, tension, irritability, dizziness, pounding heartbeat, and other physical symptoms; the recommended dose is 15 mg. https://www.drugs.com/buspar.html.

[6] Seroquel is an antipsychotic medication used to treat schizophrenia and bipolar disorder. https://www.drugs.com/seroquel.html.

[7] "Global Assessment of Functioning," or "GAF," is part of the protocol set forth in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Revised* (DSM-IVR).
   Utilizing the GAF, the clinician describes, on a scale of 0-100, the overall effect of the patient's mental health disorder on their ability to function in activities of daily living, as well as socially and occupationally. DSM-IVR, pp. 32-34. "A **GAF of 31 to 40** denotes "some impairment in reality testing or communication . . . Or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work . . .)". A **GAF of 41 to 50** describes "serious symptoms (e.g. suicidal ideation . . . ) . . . Or any serious

getting specific answers was at times difficulty; she had disorganized and obsessive type thinking. AR534, 536. Her attention and concentration were a little decreased and insight was mildly decreased, though her judgment was fair. AR536. It was difficult to interrupt her at times when she did not want to be interrupted, but her tone was not loud, her mood was overall mildly anxious with a slightly restricted affect. Id.

While hospitalized, she attended occupational therapy, wherein she exhibited loosely associated content and did not respond to peers' input. AR512-513. She was focused on decorating/writing on materials and completely filled all paper surfaces with symbols, words, or letters that were not visibly related to the group topic; she typically left early or inquired about when a group would be done. Id.; AR513.

She had difficulty making decisions and was unable to identify what brought her to the hospital nearly two weeks into her stay; her thoughts were disorganized and she was disrespectful and demanding of staff, snapping her fingers when she did not receive an immediate response; she was not consistent in taking her prescribed medications. AR524-525.

An application for SSDI was started and was sent to Ms. Lenning's sister to finish while she was hospitalized. AR526.

Upon discharge, she appeared calmer and stopped demonstrating her unusual behaviors; however, during her review period, she destroyed a library

_____

impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See id. p. 32.

book and was given a bill. AR514; 526-527. She was discharged on April 6, 2015, and was sent home with a 5-day supply of Lexapro,[8] BuSpar, and Restoril,[9] as well as Risperdal.[10] AR498; 527.

The day after discharge, Ms. Lenning underwent a psychiatric evaluation with Carrie Dylla, PA-C. AR619. Ms. Lenning reported that prior to hospitalization she had experienced worsening depression, at which time her mother was struggling with depression as well; her mother had been psychiatrically hospitalized and underwent electroconvulsive therapy. AR619. As her mother improved, Ms. Lenning reported her symptoms became worse, and eventually led to her first hospitalization. Id. She indicated she had not been cooperating in taking her medications as dosed. Id.

Ms. Lenning reported at the time of PA Dylla's examination that she was on a combination of medication she found very helpful, and she was eating and sleeping well. Id. She stated she was trying to fill her days with more positive activities. Id.

Upon examination, Ms. Lenning's mood was stable, with a perhaps mild constricted affect that became more expansive as the visit progressed and

---

[8] Lexapro is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Escitalopram affects chemicals in the brain that may be unbalanced in people with depression or anxiety. Lexapro is used to treat anxiety and depression. https://www.drugs.com/lexapro.html.

[9] Restoril is a benzodiazepine used to treat insomnia. https://www.drugs.com/restoril.html.

[10] Risperdal is an antipsychotic medication used to treat schizophrenia and bipolar disorder. https://www.drugs.com/risperdal.html.

better rapport was achieved.  AR620.  As her insight and judgment were fair,
Ms. Lenning was assessed with a GAF of 45-50, with diagnoses of major
depression with psychotic features and dependent traits.  Id.

Ms. Lenning went to the Brown Clinic, PLLP for an evaluation with Jon
McAreavey, M.D., for memory loss on April 28, 2015.  AR416.  Ms. Lenning felt
she was no longer able to make good judgments and had poor insight.  Id.

Health Services Center (HSC) reported a dissociative or fugue episode;
when she was in the custody of law enforcement, she had some disorganized,
yet obsessive type thinking and would at times respond to questions correctly,
but at times she did not.  Id.

Ms. Lenning attributed her admission to Prairie St. Johns to lack of
sleep.  AR738.  She reported she had not slept and ended up driving to
Freeman and did not realize it.  Id.

She reported stressors of she and her sister were caregivers for a cousin
who passed away in December, 2014; her mother was ill at this time; and she
had also started attending AA and started to deal with all her past abuse.
AR418.  She reported feelings of guilt because of not working and had
flashbacks of morbid times, in addition to poor sleep.  AR417-418.  Her mood
and affect were appropriate, though flat and depressed, with monotone speech
and fair insight.  Id.

Ms. Lenning was referred to radiology for her memory issues, as
Dr. McAreavey was concerned that she was previously a high functioning nurse
and wanted to ensure there were no underlying medical causes for her

17

psychiatric conditions.  AR418.  Magnetic Resonance Imaging Scan (MRI) of the head was negative.  AR433.

On May 14, 2015, Ms. Lenning returned to PA Dylla for follow up. AR615.  Her mood was stable and affect was more bright.  AR616.  Ms. Lenning reported she was quite pleased with her status; she stated she was getting more projects done at home and was overall feeling well.  Id.  PA Dylla assessed her with a GAF of 45-50 on May 14.  AR616.

Ms. Lenning reported a very nice experience where she was able to attend the pinning ceremony for her daughter at the end of nursing school, and Ms. Lenning actually did the pinning.  Id.  PA Dylla commended her on her progress.  Id.

In early June and July 2015, Ms. Lenning was experiencing a low point and felt flatter and lower, though at the same time feeling somewhat anxious; she stated the increase in Lexapro had been helpful, but she did not perceive benefit from BuSpar; PA Dylla increased Lexapro to 15 mg then 20 mg and decreased BuSpar to 7.5 mg a week, with instructions to discontinue after. AR612; 614.

Ms. Lenning endorsed anxiety and appeared with a depressed mood with a flat affect on July 22, 2015; a higher dose of Lexapro was helpful.  AR610. She stated lorazepam had been helpful, but room for improvement remained. Id.  Her mental status examination and assessment remained unchanged.  Id.

On August 17, 2015, Ms. Lenning stated she was not feeling anxious, but did feel depressed with no suicidal thoughts.  She was assigned a GAF

18

score of 45-50.  AR605.  She stated she was appreciative of the CARE program and services offered.  Id.  Her mental status examination and assessment remained unchanged.  Id.  PA Dylla transitioned Ms. Lenning off Lexapro and onto Venlafaxine and recommended she continue the CARE program.  Id.

On September 14, 2015, Ms. Lenning reported she continued to feel depressed; she felt Effexor[11] had been helpful.  AR603.  She stated she did not feel particularly anxious and felt clonazepam was helpful.  Id.  She stated she spent time during the day working on house chores; she was doing some canning.  Id.  Her mental status examination and assessment remained unchanged.  Id.

On September 28, 2015, Ms. Lenning stated Effexor continued to be helpful; she continued with house chores and canning; she desired to stop Risperdal. AR601.  Her mental status examination changed slightly, with an annotation of "Mood is perhaps depressed; however it is improving," but the assessment remained unchanged.  Id.  PA Dylla decreased her Risperdal to 1 mg.  Id.

On October 12, 2015, Ms. Lenning stated Effexor continued to be helpful; she had decreased Risperdal to 1 mg at bed time and was falling asleep readily; she was still somewhat fatigued and flat feeling in the day; she wanted to eventually discontinue Risperdal.  AR599.  The mental status examination

---

[11] Effexor is used to treat major depressive disorder.
https://www.drugs.co/Effexor.html

and assessment was unchanged from the previous examination. Id. PA Dylla told Ms. Lenning to decrease Risperdal to 0.5 mg. Id.

On November 2, 2015, Ms. Lenning stated Effexor continued to be helpful; she wanted to get rid of Risperdal; she was getting along well with her family and filled in PA Dylla on her mother's current treatment. AR597. Her mental status examination and assessment remained unchanged. Id. PA Dylla told her to discontinue Risperdal. Id.

On December 1, 2015, Ms. Lenning reported Effexor continued to be helpful; she continued to feel down; she stated she was doing well without Risperdal; she stated she was getting along well with her mother. AR595. Her mental status examination and assessment remained unchanged. Id. PA Dylla told her to increase Venlafaxine. Id.

On January 5, 2016, Ms. Lenning went for an evaluation with PA Dylla; while she felt an increase in Effexor continued to be helpful, she struggled with feeling "a little blah." AR593. When told Effexor could not be increased, she wondered if she could try something else. Id. She stated she continued to do well without Risperdal and wanted to continue off it. Id. Her mental status examination and assessment remained unchanged. She again was assigned a GAF score of 45-50. Id.

Ms. Lenning was admitted on South Dakota hold at the Avera McKennan Hospital on February 13, 2017, for prevention of self-harm and deterioration in function; police had brought her in after finding her unresponsive to police questioning but breathing; she kept her eyes closed when talking to

paramedics, who found her nude with her house a mess after she smashed jars of canned vegetables throughout the house.  AR627; 672; 675.  She complained of feeling tired and cold and did not know the date, though she knew the month and year.  AR673.

When she arrived at the hospital, her therapist noted that this behavior was a "drastic change" from her norm and revealed that Ms. Lenning had called the on-call provider multiple times the past weekend; a 24-hour hold was placed.  AR675.  Upon admission, she reported being "up and down" since her last psychiatric admission in 2015, though she was seeing a psychiatrist and had been medication compliant.  AR627.  Her main concern was her "sleep patterns are off track."  Id.  She stated she was not able to sleep, though was unable to recall other details as to what led to her coming in for treatment.  Id. She believed she sought emergency treatment the day prior after talking with her therapist and recalled that the sheriff brought her to Behavioral Health, but did not know the details, aside from that she was very agitated and required Zyprexa IM.[12]  Id.

The intake assessment revealed that Ms. Lenning was found naked at her mother's home after she had "trashed the house;" she was previously physically abusive to her boyfriend and destroyed their home.  Id.  Ms. Lenning report her main stressor was helping with her parents because of an increased

_____

[12] Zyprexa IM is an antipsychotic medication used to treat schizoaffective disorder and bipolar disorder.  "IM" is intramuscular, and this form of the medication is injected rather than taken orally. https://www.drugs.com/cdi/Zyprexa-intramuscular.html.

amount of doctor appointments; she had become more anxious, and was hyperactive, running errands, cleaning, and "very, very busy" to keep "herself occupied," then she would "slow down."  AR628.

At her psychiatric interview, she referred to difficulties sleeping numerous times, noting that her "sleep pattern" was "off" and believed she needed help with that as her reason for being hospitalized.  Id.  She was fidgety, slightly anxious, and rubbing her hands during an interview, with tangential and disorganized thought process and limited judgment and insight. AR630.  Her attention, concentration, and fund of knowledge were fair, but she had no convulsions, delusions, hallucinations, homicidal ideations, obsessions, paranoia, response to internal stimuli, or suicidal ideation.  Id.

Throughout her hospitalization, she was agitated and aggressive, tearing apart her room and required intramuscular administration of Haldol,[13] Ativan, and Benadryl, after which, she calmed.  AR631.  She acted bizarrely, standing in the shower with all her clothing on and engaging in purposeless activity by arranging and rearranging things in her room, slow to respond to questions.  Id.

By February 21, attending physicians believed she was cycling, though she remained despondent, disorganized, bradykinetic, and bradylalic.[14] AR632.  She did, however, sleep better, and was compliant with medication.

---

[13] Haldol is an antipsychotic medication used to treat schizophrenia. https://www.drugs.com/mtm/haldo.html.

[14] "Bradykinetic" means slow moving; "bradylalic" means abnormal slowness or deliberation in speech.

Id.  Memory deficits were present due to psychosis.  AR633.  Ms. Lenning was discharged on February 22 when psychiatrically stable, with medications of Depakote ER 24 hr[15] 250 mg, Lexapro 5 mg, Ativan 1 mg, Mysoline 50 mg, and Seroquel 400 mg, and with a diagnosis of schizoaffective disorder, bipolar type. AR635-636; 647.

As of the hearing on June 14, 2017, Ms. Lenning's medications included: Divalproex, E.C., 500 mg for mood stabilization; Melatonin 3 mg, for sleep; Risperdal, 3 mg, for antipsychotic hallucinations, delusions, disorganized thinking, paranoia; Acetaminophen, 500 mg, for joint pain; Calcium Carbonate for bone health.  AR302.  Melatonin, Divalproex, and Risperdal were prescribed by Carrie Dylla, P.A.  Id.

### 3.    Evidence Related to Physical Impairments

The parties included a description of the record evidence relating to physical impairments in their joint statement of facts.  See Docket No. 18 at pp. 21-24, ¶¶ 140-61.  That statement of facts is incorporated herein by reference.  However, because no issues are raised in this appeal concerning Ms. Lenning's physical impairments, the court does not reproduce that portion of the parties' joint statement herein.

### C.    Hearing Testimony:

Ms. Lenning testified that her last attempt to work was not successful because she felt overwhelmed with anxiety and cried a lot.  AR42.  She testified

---

[15] Depakote ER is used to treat manic episodes of bipolar disorder. https://www.drugs.com/mtm/depakote-er.html.

that she was admitted to the mental hospital for the first time in March, 2015. AR43. She testified that during her hospitalization, she was overwhelmed and did not understand the treatment plan. AR45. She testified that her current medication list included acetaminophen, extra strength, 500 milligrams, 2 tablets every 4-6 hours as needed; Divalproex, 500 milligrams, 3 tablets at bedtime; and Risperdal, 3 milligrams, 1 at bedtime for psychotic episodes. AR47.

She testified that her daily activities around the time of the hearing included doing the dishes, watching TV, lying down before lunch, eating dinner with her boyfriend, then lying back down. AR49. She testified she lied down because she had no interest in doing anything and had a lot of fatigue. Id. She testified other activities included maybe a load of clothes, going outside in the afternoon, watering flowers she planted, occasionally visiting her parents. AR50. She described being in a depressive state around that time. AR50.

She testified she believed the most recent hospitalization was precipitated by her disrupting the home. AR51. She reported she has memory problems and difficulty concentrating to complete a task, which causes her to take longer. AR53. She testified she does not really have an interest in movies, and if she started to watch a movie she would lose interest after maybe 20 minutes or so. AR54.

Ms. Lenning testified that she becomes anxious with just a handful of people and feels like the walls are closing in; she withdraws when that

happens.  Id.  She testified she has to concentrate on one thing at a time to complete tasks due to her anxiety, and that causes her to take longer.  AR55.

She testified that she has some recall of an event precipitating one of her hospitalizations, in which she drove 200 miles and could not remember how or why she was there.  Id.  She testified she had a slight panic attack trying to find her brother's new address in a different state because she got mixed up on the directions.  AR56.

She testified she thinks she can lift 10 pounds and can probably lift a gallon of milk.  Id.  She testified it has helped her back pain that she does not use her back as much.  Id.  She testified if she attempts an activity using her back, it affects her sleep and she needs to take Tylenol.  AR57.  She answered affirmatively her attorney's question whether she had injections in her back when she had insurance.  Id.

Her attorney asked, "You've also been diagnosed, at least it's mentioned a few times, with fibromyalgia.  Is that correct?"  AR57.  Ms. Lenning responded, "That's correct."  Id.  When asked what symptoms she attributed to fibromyalgia, Ms. Lenning testified a lot of the fatigue was fibromyalgia and also stiff and sore muscles.  Id.

She testified that after her hospitalization in February, 2017, she began attending an aftercare program with social workers and counselors; she participated in group activities and individual counseling there.  AR59.

She testified she is able to stand for 15 minutes at one time, sit for at least 15 or 20 minutes at one time, and walk around the block.  AR66.

The vocational expert testified that an individual of the same age, education, and work experience at Ms. Lenning, who can occasionally lift and carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks for 2 hours in an 8-hour day; sit with normal breaks 6 hours in an 8-hour day; frequently climb ramps, stairs, ladders, ropes, scaffolds; occasionally stoop; frequently kneel, crouch and crawl; avoid even moderate exposure to hazards; understand, remember and carry out routine, simple instructions; interact appropriately with supervisors, coworkers, and the general public; respond appropriately to changes in a routine work setting; and make judgments on simple work-related decisions would not be able to perform Ms. Lenning's past work but could perform other sedentary unskilled jobs that exist in significant numbers in the national economy. AR61-62.

The vocational expert testified that if the individual was markedly limited in the ability to understand, remember, or apply information; in the ability to interact with others; in the ability to concentrate, persist, or maintain pace; in the ability to remember locations and work like procedures; has fair ability to function independently, appropriately, and effectively on a sustained basis; is moderately limited in the ability to adapt or manage oneself and in the understanding and carrying out of very short, simple instructions; can only maintain concentration for 15 minutes before needing redirection or requiring a break; would be off task more than 25% of the day and would miss over 4 days of work per month, that the individual would not be able to perform any jobs. AR63.

The vocational expert testified that with the limitations in the first hypothetical, including standing/walking for only 2 hours in an 8-hour day, "very quickly we're going to sedentary work." AR65. The vocational expert identified three unskilled light exertion jobs performed primarily from a seated position; electronics worker (726.687-010), bench assembler (706.684-022), and inspector and hand packager (559.687-074). AR65. The vocational expert testified that if the hypothetical question changed the standing/walking from two hours to six hours, the identified jobs would remain. AR65. The vocational expert testified that if the individual needed to shift positions every 15 minutes, there would be no jobs that the individual could perform. AR67.

## DISCUSSION

### A.   Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

**B.     The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[16]  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One**:  Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

> **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821

---

[16] Although Ms. Lenning has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical.  It is understood that both Titles are applicable to Ms. Lenning's application.  Any divergence between the regulations for either Title will be noted.

(8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof

shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This

shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.    The Parties' Positions**

Ms. Lenning asserts the Commissioner erred in two ways: (1) the ALJ did not properly evaluate the opinion evidence of PA-C Carrie Dylla and, therefore, determined a mental RFC not supported by substantial evidence in the record; and (2) the ALJ did not properly assess Ms. Lenning's credibility. The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed.

**E.    Evaluation of PA Dylla's Opinion and the RFC Determination**

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important

issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147

(8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222

F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's

mental and physical impairments in combination, including those impairments

that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social

Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the

ALJ "bears the primary responsibility for assessing a claimant's residual

functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[17]  Lauer, 245 F.3d at 703 (citations

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support

the determination of the claimant's RFC, and the ALJ should obtain medical

evidence that addresses the claimant's ability to function in the workplace."  Id.

(citations omitted).

"The RFC assessment must always consider and address medical source

opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the

opinion of a medical source, the ALJ "must explain why the [medical source]

opinion was not adopted."  Id.  "Medical opinions from treating sources about

_____

[17] Relevant evidence includes:  medical history; medical signs and laboratory
findings; the effects of treatment, including limitations or restrictions imposed
by the mechanics of treatment (e.g., frequency of treatment, duration,
disruption to routine, side effects of medication); reports of daily activities; lay
evidence; recorded observations; medical source statements; effects of
symptoms, including pain, that are reasonably attributable to a medically
determinable impairment; evidence from attempts to work; need for a
structured living environment; and work evaluations.  See SSR 96-8p.

the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>Reed</u>, 399 F.3d at 923 (cleaned up); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

Because an RFC formulation must be based on some medical evidence, the issue of how an ALJ evaluates medical opinions is relevant to the RFC issue. Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. <u>See</u> 20 C.F.R. § 404.1527. All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined the claimant;
>
> --whether the person giving the medical opinion treated the claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;
>
> --whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a

claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Wagner, 499 F.3d at 849; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue 513 F.3d 788, 792 (8th Cir. 2008)(citing Casey v. Astrue, 503 F.3d 687, 691-692 (8th Cir. 2007). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

Ms. Lenning asserts the ALJ erred by assigning "little weight" to the opinion of her treating counselor, PA Carrie Dylla. The ALJ noted that even

though Ms. Dylla was a treating provider, she was not an "acceptable medical source" under the regulations (20 C.F.R. § 416.902). That regulation provides that licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, qualified speech pathologists, licensed audiologists, licensed advanced practice registered nurses, and licensed physician's assistants are "acceptable medical sources." Id. Only "acceptable medical sources" are qualified to provide the evidence necessary to establish the *existence* of a medically determinable impairment. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). Likewise, only "acceptable medical sources" can provide medical opinions or be considered a treating source. Id.

According to 20 C.F.R. § 416.913(d)(1) as it existed on the date of the ALJ's decision,[18] however, Ms. Dylla would have been an "other source" whose opinion the ALJ could have considered to determine the *severity* of Ms. Lenning's impairments, and to determine how such impairments affected Ms. Lenning's ability to work.

Ms. Dylla's source statement for psychological conditions was written June 5, 2017. AR757-61. Ms. Dylla indicated that she began seeing Ms. Lenning on April 7, 2015. AR757. Because Ms. Dylla was not an acceptable medical source, she was not allowed to *establish* the presence or

_____

[18] The regulations have since been amended and reorganized. The 2017 versions of § 416.913 and § 416.927 (regarding sources of medical evidence and the weight to be assigned to medical opinions) have been rewritten. However, the rewritten versions indicate they are only applicable prospectively to claims filed after the change. In the case of § 416.913 and § 416.927 the changes are applicable only to claims filed after March 27, 2017. Ms. Lenning filed her claims in 2015. AR15.

identity of Ms. Lenning's mental impairments, but she reiterated those diagnoses which had previously been made by acceptable medical sources: schizoaffective disorder, bipolar type; major depression [with psychotic features]; and dyssomnia. AR757. Ms. Dylla *is* qualified to opine about the severity of Ms. Lenning's undisputed medical impairments, and how those impairments affected Ms. Lenning's ability to work. Sloan, 499 F.3d at 888; Shontos, 328 F.3d at 426.

Ms. Dylla was asked to identify the signs and symptoms exhibited by Ms. Lenning which were associated with her diagnoses. Ms. Dylla identified the following: disturbance of mood accompanied by full or partial depressive syndrome, bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. AR757. Ms. Dylla elaborated that Ms. Lenning's depression included a pervasive loss of interest in almost all activities, sleep disturbance, psychomotor retardation or agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. AR758.

Ms. Dylla elaborated that Ms. Lenning's manic syndrome included hyperactivity, pressured speech, flight of ideas, a decreased need for sleep, easy distractibility, and hallucinations, delusions or paranoid thinking. AR758. Ms. Dylla described Ms. Lenning's anxiety to be manifested by motor tension. Id. Ms. Dylla described the following symptoms associated with Ms. Lenning's schizoaffective disorder: delusions or hallucinations; disorientation as to time and place; memory impairment, including an inability to recall her most recent

38

inpatient hospitalization at Avera Behavioral Health in February, 2017; personality change; emotional lability; a demonstrated history of more than 1 year's inability to function outside a highly supportive living environment; and a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensation.  Id.

Ms. Dylla rated Ms. Lenning markedly limited in her ability to understand, remember, apply information, concentrate, persist, and maintain pace.  AR759-60.  Ms. Dylla explained this was due to Ms. Lenning's disrupted mood stability which impaired her cognitive functioning.  Id.  This impairment included remembering locations and work-like procedures, understanding and carrying out very short and simple instructions, and understanding and carrying out detailed but uninvolved written or oral instructions.  Id.  Ms. Dylla estimated Ms. Lenning could maintain attention and concentration for 15 minutes at a time before needing redirection or a break.  AR760.

Ms. Dylla rated Ms. Lenning markedly impaired in her ability to interact with others.  AR759.  She explained Ms. Lenning's instable mood impairs her interpersonal relationships.  Id.

Ms. Dylla rated Ms. Lenning moderately limited in her ability to adapt or manage herself.  Id.  Ms. Dylla opined Ms. Lenning would not be able to maintain regular attendance and punctuality.  AR760.  She also opined Ms. Lenning could not work appropriately with the general public or co-workers.  Id.  She would be able to work sometimes, but not consistently, with

supervisors.  AR761.  Ms. Dylla explained that these answers were given because Ms. Lenning experiences disruption of thought and instability of mood in several situations.  Id.  For this reason also, Ms. Dylla opined Ms. Lenning could not maintain socially appropriate behavior or respond appropriately to changes in work settings.  Id.  Ms. Dylla opined Ms. Lennings' mental impairments would cause her to be off task 25 percent of a typical workday. Id.  She opined Ms. Lenning would miss 4 days of work per month if she were trying to work full time.  Id.  Ms. Dylla stated Ms. Lenning's prognosis was guarded.  AR757.

Had the ALJ given significant weight to Ms. Dylla's opinion testimony, the conclusion that Ms. Lenning is disabled would be inescapable.  But the ALJ gave that opinion only "little weight."  The ALJ's decision in this regard is not sustainable on this record.

As stated above, the RFC must be based on some medical evidence. Lauer, 245 F.3d at 703.  The ALJ credited the state agency psychologists' opinions, who never saw and never treated Ms. Lenning, over the opinion of her treating medical source, Ms. Dylla.  Their opinions alone cannot constitute substantial evidence in the record.  Wagner, 499 F.3d at 849; Lacroix, 465 F.3d at 888.

Furthermore, the state agency psychologists gave their opinions prior to Ms. Lenning's 2017 psychiatric hospitalization.  AR25.  Thus, the state agency psychologists did not have the benefit of those 2017 records when rendering their opinions.  Id.  This is significant not just because the 2017 hospitalization

represents another significant period of decompensation in Ms. Lenning's life, but also because the 2017 hospitalization occurred at a time when Ms. Lenning was compliant in taking her medications. And her mental illness nevertheless overtook her and rendered her unable to care for herself at all for a significant period of time. This is doubly significant as the ALJ explained away all three of Ms. Lenning's psychiatric hospitalizations by asserting that they occurred when she was not compliant in taking her medications.[19] AR23.

The ALJ also explained away these hospitalizations by asserting they occurred due to unique situational stressors—caring for family members. But the nature of holding a real job in the real world is that unanticipated stressors do come up and have to be dealt with, so situational stressors cannot be disregarded as "unique." Furthermore, Ms. Lenning has numerous family members—a mother, a son, a boyfriend—and when one has connections to other people, they sometimes buoy you up, but they sometimes require time, attention, and effort from you. Again, stressors associated with one's relatives cannot be dismissed as "unique."

The ALJ further attempted to undermine Ms. Dylla's opinion by asserting that it was inconsistent with the record as a whole. In particular, the ALJ asserted the record showed that in between psychiatric hospitalizations,

---

[19] Even if it were true that Ms. Lenning was not compliant with taking medications immediately preceding her three psychiatric hospitalizations, the court fails to see how that can be held against her when she was demonstrably out of touch with reality. This seems part and parcel of the manifestation of her actual mental impairments rather than some voluntary choice on her part.

Ms. Lenning was able to function well on her medications.  AR23-24.  In this regard, the ALJ repeatedly cites to "normal" mental status exams.  AR19, 24.

Prior to Ms. Lenning's first two psychiatric hospitalizations, counseling records show that her mental status was anxious, frustrated, and depressed.  AR351-58.  Medical records during this 2014-15 time frame likewise reflect that she was experiencing anxiety and depression, including two panic attacks, one of which landed her in the emergency room with racing heart rate, palpatations, elevated blood pressure, and crying.  AR362, 367.  This was during a time when she was prescribed Elavil, Celexa, Xanax, Prozac, lorazepam, and amitriptyline.  AR365, 368, 371, & 392.  Her mood was noted in medical records to be depressed with a flat affect.  AR365.

Ms. Lenning was first hospitalized psychiatrically at Prairie St. John's in Fargo, North Dakota, because she was exhibiting bizarre behavior like writing on the walls with markers.  AR407, 412.  At this time she also exhibited suicidal ideation.  Id.  Ms. Lenning's behavior and appearance at Prairie St. John's continued to be abnormal, including memory issues, paranoid delusions, dysphoric mood, impulse control problems, argumentative mood, and flat affect.  AR398-404.  One doctor noted he explained Ms. Lenning's medications to her daily, but the next day she would have no recollection of these explanations.  AR398.  Ms. Lenning was discharged on March 9, 2015, with prescriptions for Buspar, Citalopram, Seroquel and Klonopin.  AR394.

Five days later Ms. Lenning was involuntarily committed to the Human Services Center ("HSC") in Yankton, South Dakota, also a psychiatric hospital.

AR538.  While in police custody immediately prior to her commitment, she displayed disorganized and obsessive thinking and at times did not answer questions appropriately.  AR534.  She came to the attention of police because she drove 200 miles very fast with no memory of why; she was found in a stranger's house eating their food with no explanation why; and she had disorganized thoughts, obsessive thinking, and continued to write on the walls with markers.  AR438, 540.

Medical staff at HSC told Ms. Lenning's father they would start an application for her for disability benefits and then provide the application to him to finish.  AR540-41.  Ms. Lenning's family has a significant history of mental illness; her son has depression with psychotic features and has himself been psychiatrically hospitalized.  AR535.  Her maternal cousin was diagnosed with schizophrenia.  Id.  Also, the record is sprinkled with references to her mother's psychiatric treatments, including electro convulsive therapy.  See, e.g. AR619-20.

When initially hospitalized at HSC in 2015, Ms. Lenning was forcibly medicated.  AR540.  She was also placed on escort status because she destroyed HSC property, went into other patients' rooms uninvited, and did not come to the unit on time.  AR540-41.  At one point she took another person's necklace and ring and started wearing it.  AR541.  She demanded to know about other patients' private information.  AR540.  She displayed an almost total lack of blinking.  AR536.  She spoke rapidly so that it was difficult to interrupt her.  Id.  She continued writing on walls and other surfaces

obsessively.  AR525-26, 529.  She made others in her therapy group uncomfortable by invading their private space, coming right up behind them and removing tape from the roll very quickly so that the sound was startling.  AR512.  She taped the length of tables, underneath, then around the table in group sessions.  AR512.  She was oblivious to the discomfort she was causing to her fellow patients.  Id.  Medical providers noted "she is obviously not able to take care of herself."  AR537.

Even 10 days after admission to HSC and receiving forced medications, Ms. Lenning continued to exhibit bizarre behavior.  She obsessively folded paper; filled all papers with unrelated symbols, words and numbers; she laid multiple towels on the floor between her bathroom and bedroom without any reason why; she placed tape on walls, white boards, tables and desks without being able to give a reason why.  AR513, 525.  After two weeks of hospitalization and forced medication, Ms. Lenning would still give inconsistent, irrelevant, or disorganized answers such as "anger is a stressor which she copes with by being angry."  AR513.

Ms. Lenning described her life prior to hospitalization, stating that she was afraid to go out in public, had been having a lot of depression, had been experiencing a lot of anxiety especially at night, was having a hard time making decisions, and had a hard time remembering things.  AR524.  "Informants" told HSC staff that Ms. Lenning had previously no history of gambling, but had recently taken up gambling.  AR507.  These same sources explained that Ms. Lenning's lack of medication compliance was due to a combination of lack

44

of funding for prescriptions, lack of insight on her part, and simple noncompliance. AR506.

Ms. Lenning was discharged from HSC on April 6, 2015, although medical care providers wrote they were unable to achieve their treatment goal with Ms. Lenning because—even though she was compliant with her medications by the time of her discharge--she was unable to articulate what circumstances caused her hospitalization. AR526, 533. During her hospitalization, she was diagnosed with major depression with psychotic features, schizoaffective disorder and personality disorder. AR529, 536.

The very next day after her discharge from HSC, Ms. Lenning began seeing Ms. Dylla. AR416, 619. Her medications at this time consisted of Risperdal, Lexapro, and Restoril. AR619. An MRI was completed to rule out any physical cause of Mr. Lenning's mental aberrations. AR416-18. The MRI was completely normal.

Post-discharge, when Ms. Lenning was medication-compliant, medical records indicate her mood was nevertheless depressed, she had a flat affect, and her speech was monotone. AR418. Over the course of the next two years, Ms. Dylla frequently recorded that Ms. Lenning's mood was depressed and her affect flat. AR593, 595, 597, 599, 601, 603, 610, 612, 614. She also experienced significant anxiety frequently. AR610, 612, 614. There was only one session, approximately one month after her discharge from HSC, where Ms. Lenning expressed satisfaction with her medications and her mental status. AR616.

Although Ms. Lenning remained medication-compliant for the two years after her HSC hospitalization (she explained she uses a pill box to keep track, AR627), she was again involuntarily hospitalized on February 13, 2017. AR643. Ms. Lenning's daughter found her naked in her mother's house which she had destroyed by breaking glass canning jars of food. Id. Ms. Lenning was yelling and throwing things. AR675. The house was destroyed, upstairs and down. Id.

Police were called to the scene and Ms. Lenning laid in a recliner, refusing to dress and refusing to open her eyes, though she did speak to the paramedics with her eyes closed. AR672, 675. She answered their questions, but had to think for a bit before answering. AR673. She knew the month and the year, but could not tell them the day or the date. Id.

Emergency responders spoke to Ms. Dylla, who told them this was a drastic change from Ms. Lenning's norm. AR675-76. The first 48 hours of her admission, Ms. Lenning was administered Haldol and Ativan intramuscularly to calm her down as she was quite agitated and aggressive, tearing apart her room. AR631. Bizarre behavior ensued such as showering fully clothed, laying out foam bathroom doors on the floor to rest on, catatonic behavior, and hearing voices that others could not hear. AR627, 631. Upon discharge, she exhibited blunted affect; slowed, soft, paucity of speech; limited insight; and impaired judgment. AR632-33. Her mood was despondent and she had slowed psychomotor movements. Id. Her new medications upon discharge were Depakote, Lexapro, Lorazepam, Primidone, and Seroquel. AR636.

Ms. Lenning's ALJ hearing was held just a few months after this February, 2017, psychiatric hospitalization.  AR36.

Thus, Ms. Dylla's opinions were not at all inconsistent with the records in evidence.  The evidence, both during and in between psychiatric hospitalizations, demonstrates support for Ms. Dylla's opinions.  During outpatient periods of time, Ms. Lenning continued to exhibit depressed mood, anxiety, flat affect, and significant memory lapses, such as the fact in June, 2017, she could not remember her psychiatric hospitalization from four months earlier.

Furthermore, although Ms. Dylla's status as a non-acceptable medical source means she could not opine as to diagnoses, she did no such thing.  Ms. Lenning's diagnoses were made by acceptable medical sources during her hospitalizations.  The topics Ms. Dylla *did* offer opinions on—the severity of Ms. Lenning's symptoms and her ability to function—are topics perfectly permissible for non-acceptable medical sources to opine on.  Sloan, 499 F.3d at 888; Shontos, 328 F.3d at 426.  The Commissioner's own rulings indicate that "opinions from [non-acceptable] medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects" SSR 06-03p at p. 8.

The ALJ also characterized Ms. Dylla's opinion as not containing sufficient detail and not persuasive in its rationale.  The court finds this reason unavailing.  The state agency psychologists on whose opinions the ALJ did rely are even less detailed than Ms. Dylla's.  Compare AR 82-83, 113-14 (the

47

substantive portions of the state agency opinions), <u>with</u> AR757-61 (Ms. Dylla's opinion statement). And the state agency opinions are based on insufficient evidence from the record and not informed by a treating or examining relationship. The Commissioner directs ALJs to give weight to treating sources like Ms. Dylla, taking into consideration the length of treatment and number of times the source has seen the claimant. SSR 06-03p. Depending on the circumstances, the Commissioner recognizes that the opinion of a treating non-acceptable medical source may outweigh the opinion of an acceptable medical source. <u>Id.</u> at p. 11.

The ALJ included a full paragraph discussing GAF scores (AR25) and, accordingly, the parties discuss this issue. The court finds this a bit of a red herring. Ms. Dylla did not recite or rely on GAF scores in rendering her opinions as to the severity of Ms. Lenning's symptoms and the effect of those symptoms on her functioning. AR757-61. However, the court will briefly address their significance.

GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most healthy mentally. A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty. <u>Nowling v. Colvin</u>, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016). A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. <u>See</u> https://www.webmd.com/mental-

health/gaf-scale-facts, last checked July 19, 2019.  Ms. Lenning has been assigned GAF scores as low as 30.  AR25 (citing Exhibits 5F & 9F).

Although GAFs were state-of-the-art science in the past, both the Eighth Circuit and the Commissioner have recognized since at least 2010 that GAF scores have limited importance.  Nowling, 813 F.3d at 1115 n.3.  The "Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings."  Id. (quoting Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010)).  The Diagnostic and Statistical Manual of Mental Disorders ("DSM")-IV (American Psychiatric Assn. 2000), previously contained references to GAF, but explained that GAF scores have no little or no bearing on an individual's occupational and social functioning.  Jones, 619 F.3d at 973 (quoting Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx. 496, 511 (6th Cir. 2006)).  The new DSM-5 (May, 2013), dispensed with the GAF score.  Ms. Lenning's GAF scores play no part in this court's opinion.

Returning to the ALJ's analysis, another reason the ALJ gave Ms. Dylla's opinion "little weight" was because the ALJ asserted that opinion was inconsistent with Ms. Lenning's activities of daily living ("ADLs").  AR23.  In this regard, the ALJ emphasized Ms. Lenning's comments to her providers that she tried to stay busy cleaning house, she had been "out and about," she experienced remissions of her panic attacks, she helped care for a cousin, she

tried to fill her day with more positive activities, and she did some canning, walking and biking.  AR24-25.

The court notes that these references in the record evince sporadic activity, at best.  None of the references indicate Ms. Lenning was able to perform any of these ADLs, or any combination of them, for 8 hours a day, 5 days a week as would be required of a real job in the real world.  Furthermore, the court notes the activities are almost entirely solitary—they do not require Ms. Lenning to work side-by-side with anyone—again, for 8 hours a day, 5 days a week.  This is significant in light of the interpersonal limitations in the workplace opined upon by Ms. Dylla and testified to by Ms. Lenning. AR54, 760-61.

Finally, it was specious for the ALJ to reason that because Ms. Lenning was able to establish a rapport with Ms. Dylla she had "no limitations in interacting with others" in a workplace setting.  AR24.  It is one thing to establish a connection with another human being one-on-one in a quiet, controlled clinic setting with no demands made upon one to produce; it is quite another to do so in the demanding, competitive environment of a workplace for 40 hours a week.

In Nowling, Nowling's treating physician opined serious limitations and an inability to meet competitive occupational standards such as regular work attendance, punctuality, completion of a normal workday and workweek without interruptions from psychological symptoms, responding appropriately to changes in work routine, and dealing with the stress of work.  Nowling, 813

50

F.3d at 1117.  The ALJ discounted this treating medical source opinion on the basis it was inconsistent with the opinions of nontreating physicians and inconsistent with the record.  Id. at 1123.  The ALJ highlighted an entry in the treating physician's notes showing Nowling had a GAF of 56 and had demonstrated "improvement."  Id.

The court noted the longitudinal record of Nowling's treatment over two years and 38 sessions showed that Nowling's mental impairments waxed and waned, were unpredictable and sporadic, and that her structured living environment allowed her to live a more normal life.  Id.  The court held the ALJ failed to give good reasons for discounting the treating physician's opinion, failed to acknowledge the nature of Nowling's impairment, and failed to acknowledge the effect of Nowling's living environment.  Id.  This required remand for reconsideration.  Id.

The ALJ in Ms. Lenning's case made similar errors by failing to acknowledge the entire record (including the fact her most recent and serious psychiatric hospitalization came at a time when Ms. Lenning was medication compliant), failing to acknowledge the waxing-waning and unpredictable nature of Ms. Lenning's mental impairments, and by failing to acknowledge her mostly solitary, at-home living arrangement contributed substantially to her ability to function day-to-day.

For all of these reasons, the ALJ's assignment of "little weight" to Ms. Dylla's opinion is not supported by substantial evidence.  The ALJ's reliance on the state agency psychologists' opinions also does not constitute

substantial evidence in support of the mental RFC formulated by the ALJ. Remand is required here.

The ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p. As pointed out by Ms. Lenning's counsel, the ALJ need not proceed on remand with what the ALJ believes to be inadequate evidence. The ALJ could contact Ms. Dylla for further detail or clarification, arrange for a consultative mental exam, send the entire case record to a medical expert for review, or send the case back to the state agency for re-evaluation with a complete picture of Ms. Lenning's longitudinal mental health record. Accordingly, this case will be remanded for a proper consideration of all the evidence, including giving proper weight to Ms. Dylla's opinion and supplementing the record if the ALJ sees fit to do so.

**F.  Assessment of Ms. Lenning's Credibility[20]**

In determining whether to fully credit a claimant's subjective complaints of disabling symptoms, the Commissioner engages in a two-step process: (1) first, is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the Commissioner evaluates the claimant's description

---

[20] The court notes that as of March 28, 2016, the Commissioner determined to discontinue the use of the term "credibility" in its sub-regulatory policy. See SSR 16-3p (which superseded SSR 96-7p). The Commissioner wanted to make clear that in evaluating a claimant's subjective complaints of symptoms, it was not evaluating the claimant's character. Id. The court uses the term "credibility" herein because it is prevalent in the case law that has developed. Nevertheless, like the Commissioner, this court emphasizes that "credibility" is not interchangeable with "character."

of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. See SSR 16-3p; 20 C.F.R. § 404.1529. Here, the ALJ found Ms. Lenning had medically determinable physical and mental impairments that could reasonably be expected to produce her symptoms in accordance with part 1 above. So the credibility determination rested on the second prong.

In evaluating the second prong of the analysis, an ALJ must consider several factors. The factors to consider include: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Wagner, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). A claimant's subjective report of symptoms and their effects may be discredited only if they are inconsistent with the evidence as a whole. Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852

(citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

An ALJ need not methodically discuss every Polaski factor so long as the factors are all acknowledged and considered in arriving at a conclusion. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). If adequately supported, credibility findings are for the ALJ to make. Id. (citing Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006)). Generally, the ALJ is in a better position to evaluate credibility of witnesses and courts on judicial review will defer to the ALJ's credibility determinations so long as they are supported by substantial evidence and good reasons. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (stating "[w]e will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").

A claimant's work history is one of the Polaski factors an ALJ is directed to consider. Wagner, 499 F.3d at 851. Here, Ms. Lenning had a very strong record of working—she worked 18 continuous years and even made an unsuccessful work attempt after her asserted date of disability. Ms. Lenning alleges the ALJ did not consider or discuss this factor and, because it looms so

significantly in the evidence in her case, it was error for the ALJ not to consider her work history. The Commissioner asserts the ALJ did discuss Ms. Lenning's work history.

A review of the ALJ's opinion shows the ALJ recited Ms. Lenning's work history in abbreviated fashion in the background section of its opinion. AR17-18. However, the ALJ did not discuss this notable work history when assessing whether Ms. Lenning's testimony about her symptoms and how they affect her was worthy of credit. AR23-25. "A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments." Smith v. Commissioner, 738 Fed, Appx. 889, 892 (8th Cir. July 5, 2018). "[A] steady work history is generally considered indicative of credibility." Id. Here, were the ALJ's credibility assessment the only issue presented on appeal, it would be a close question whether remand was warranted. However, in combination with the ALJ's other errors as discussed above, the court remands with instructions to more fully explain the credibility assessment in light of Ms. Lenning's solid 18-year continuous work history.

## G.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Lenning requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED July 22, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge